Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Rawson Jahan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                               Plaintiffs,

   -against-

PRO HEALTH MEDICAL SUPPLY INC, YURIY
KANDINOV, and JOHN DOE DEFENDANTS "1" through
"10,"

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Pro Health Medical Supply Inc, Yuriy Kandinov, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## **NATURE OF THE ACTION**

1.     GEICO brings this action to terminate an ongoing fraudulent scheme that has been perpetuated by Defendants, who exploited the New York "No-Fault" insurance system through the

submission of more than $1 million in fraudulent claims to GEICO alone, seeking reimbursement for medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME"), represented by the Defendants to be "Osteogenesis Stimulators." The Osteogenesis Stimulators were allegedly dispensed by Pro Health Medical Supply Inc. ("Pro Health") to New York automobile accident victims insured by GEICO ("Insureds"). The Defendants dispensed the Osteogenesis Stimulators through Pro Health without regard for whether the Osteogenesis Stimulators were medically necessary or had any documented efficacy for treatment of the Insureds.

2.      Pro Health is owned and controlled by Yuriy Kandinov ("Kandinov") (Kandinov and Pro Health are the "DME Defendants") who, working with John Doe Defendants "1" through "10" ("John Doe Defendants"), devised a complex scheme to target the prescription and dispensing of expensive Osteogenesis Stimulators so that they could submit inflated claims for reimbursement to GEICO and other New York automobile insurers. Defendants typically submitted charges of $2,700.00 for each Osteogenesis Stimulator dispensed – and often billed for purportedly dispensing two Osteogenesis Stimulator to a single Insured.

3.      In furtherance of the scheme, the Defendants entered into collusive agreements with various prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with ambulatory surgical/medical clinics that treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements and to maximize profits, the Defendants steered the Prescribers and Clinic Controllers to direct large volumes of medically unnecessary prescriptions – or purported prescriptions – for the Osteogenesis Stimulators to Pro Health, often using template prescription order forms containing stamped or photocopied signatures supplied to them by the Defendants.

4.      To the extent Defendants actually dispensed the Osteogenesis Stimulators,

Defendants knew that the Osteogenesis Stimulators were not medically necessary and had no proven efficacy for the Insureds' treatment, were not  legitimately prescribed, and that the prescribing and dispensing of the devices was done solely to exploit the patients' No-Fault benefits and steal monies from insurance companies.

5.      By this action, GEICO seeks to recover approximately $261,600.00 that the Defendants wrongfully obtained, and further seeks a declaration that it is not legally obligated to pay reimbursement of approximately $713,600.00 in pending No-Fault insurance claims submitted through Pro Health, because:

(i)      Defendants billed GEICO for purported Osteogenesis Stimulators pursuant to a fraudulent scheme designed and implemented to exploit the patients for financial gain, without regard for genuine patient care, and which included dispensing Osteogenesis Stimulators that were not medically necessary and which were prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements and which were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(ii)     Defendants billed GEICO for Osteogenesis Stimulators that were provided – to the extent actually provided – as a result of decisions made by laypersons rather than licensed healthcare professionals;

(iii)    To the extent that any Osteogenesis Stimulators were provided to Insureds, the bills for the Osteogenesis Stimulators submitted to GEICO by the Defendants fraudulently mispresented the type and nature of devices provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(iv)     To the extent that any Osteogenesis Stimulators were provided to Insureds, the bills for Osteogenesis Stimulators submitted to GEICO by the Defendants fraudulently inflated the permissible reimbursement rate that the Defendants could have received for the devices.

6.      The Defendants fall into the following categories:

(i)      Pro Health is a New York corporation that purported to dispense the Osteogenesis Stimulators to persons allegedly injured in motor vehicle accidents, and then billed New York automobile insurance companies, including  GEICO, seeking reimbursement for the Osteogenesis Stimulators;

(ii)    Defendant Kandinov purportedly owns and controls Pro Health, and, along with the John Doe Defendants, used Pro Health as part of a scheme to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing the Osteogenesis Stimulators to automobile accident victims; and

(iii)   the John Doe Defendants are individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of Pro Health and the dispensing of the Osteogenesis Stimulators, engaging in collusive referral arrangements to obtain patient referrals for Pro Health, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

7.      As discussed below, Defendants at all times knew that the claims for Osteogenesis Stimulators submitted to GEICO through Pro Health were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme designed and implemented to exploit the patients for financial gain, and included dispensing Osteogenesis Stimulators that were not medically necessary and which were prescribed pursuant to predetermined fraudulent protocols and collusive arrangements; (ii) the Osteogenesis Stimulators were – to the extent provided at all – provided as a result of decisions made by laypersons rather than licensed healthcare professionals; (iii) the billing submitted to GEICO and other New York automobile insurers fraudulently misrepresented the type and nature of the devices purportedly provided to Insureds; and (iv) the bills for Osteogenesis Stimulators submitted to GEICO by the Defendants fraudulently inflated the permissible reimbursement rate that the Defendants could have received for the devices.

8.      As such, the Defendants do not have – and never had – any right to be compensated for their claims for the Osteogenesis Stimulators.

9.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims identified to date that the Defendants submitted, or caused to be submitted, to

GEICO through Pro Health.

10.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry, which began in or about early 2023, continues uninterrupted through the present day in that the Defendants continue their collection efforts on the bills submitted to GEICO seeking reimbursement for the Osteogenesis Stimulators.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Defendant Pro Health is a New York corporation with its principal place of business at 162-16 Union Tpke, Suite 218, Fresh Meadows, New York. Pro Health was incorporated on March 25, 2021, and has been used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Kandinov resides in and is a citizen of New York.  Kandinov is not and has never been a licensed healthcare provider.

14.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of Pro Health and the dispensing of the Osteogenesis Stimulators, engaging in collusive referral arrangements to obtain patient referrals for Pro Health,

5

and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

16.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

17.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

19.    GEICO underwrites automobile insurance in New York.

## I.    An Overview of the Pertinent Laws

### A.    Pertinent Laws Governing No-Fault Insurance Reimbursement

20.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

21.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including expenses for DME and orthotic devices ("OD"). See N.Y. Ins. Law § 5102(a).

23.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

24.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

26.     Alternatively, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

27.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially

false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

28.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Regulations Governing No-Fault Benefits for DME**

29.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

30.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units, infrared heat lamps, lumbar cushions, transcutaneous electrical nerve stimulators ("TENS units"), electric moist heating pads, cervical traction units, continuous passive motion devices, and devices to prevent deep vein thrombosis.

31.    Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner…has any of the following financial relationships without disclosing to the patient such financial relationship:…(b) a compensation arrangement."  See N.Y. P.H.L. § 238-d(1).  A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist,

chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist".  See N.Y. P.H.L. § 238(11).

32.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances, or equipment", which includes DME retailers such as Pro Health.  See N.Y. P.H.L. § 238(6).  A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overtly, covertly, in cash, or in kind that is between a practitioner and a health care provider.  See N.Y. P.H.L. § 238-a(5)(a).

33.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits is not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

34.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

35.    As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

> (1) the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

36.    As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

37.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

38.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

39.    The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

40.    Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

41.    For Non-Fee Schedule items, the New York State Insurance Department

recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

42.     DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up as the maximum reimbursement rates set forth above includes these services. See 12 N.Y.C.R.R. § 442.2(c).

43.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      The provider is in compliance with all significant statutory and regulatory requirements;

(ii)     the provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME  identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)     The HCPCS Code identified in the bill accurately represents the DME that was provided to the patient; and

(v)      The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule or the standard used for a Non-Fee Schedule item.

II.    **Defendants' Fraudulent Scheme**

   A. **Overview of the Scheme**

44.    Beginning in or about early 2023 and continuing uninterrupted through the present day, the DME Defendants, working with the John Doe Defendants, implemented a complex fraudulent scheme in which they used Pro Health to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they are not eligible to receive – for Osteogenesis Stimulators purportedly dispensed to automobile accident victims.

45.    The DME Defendants exploited GEICO Insureds, as well as insureds of other New York automobile insurers, by purporting to dispense Osteogenesis Stimulators to patients at various ambulatory surgical/medical clinics that treat patients with No-Fault insurance (i.e., the No-Fault Clinics).

46.    Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Defendants intentionally targeted expensive Osteogenesis Stimulators so they could submit inflated claims for reimbursement to GEICO.  In fact, Osteogenesis Stimulators accounted for 100% of the billing the DME Defendants submitted or caused to be submitted to GEICO through Pro Health.

47.    Specifically, from May 2023 through the present, the DME Defendants billed GEICO more than $1 million for allegedly dispensing Osteogenesis Stimulators to GEICO Insureds, pursuant to HCPCS Code E0760.

48.    Despite the fact that Pro Health only dispensed and billed GEICO for Osteogenesis Stimulators, Kandinov did not even know what an Osteogenesis Stimulator was used for and was unaware of the indications for when this device could be medically necessary for a patient, even

12

though he was, and is, purportedly the sole owner and sole employee of Pro Health.

49.    Osteogenesis Stimulators are medical devices used to encourage bone growth and accelerate fracture healing in limited, particular circumstances.

50.    Notwithstanding the limited, accepted uses for Osteogenesis Stimulators, the DME Defendants repeatedly billed GEICO under HCPCS Code E0760 for dispensing purported Osteogenesis Stimulators, with total charge of $2,700.000 per device, which devices were purportedly dispensed to numerous Insureds *who suffered no bone fractures whatsoever* – all solely to maximize profits without regard to genuine patient care.

51.    The DME Defendants dispensed the Osteogenesis Stimulators pursuant to medically unnecessary, boilerplate, pre-printed template prescription forms (the "Fraudulent Prescription Forms"), which were used by the Prescribers and Clinic Controllers to issue prescriptions pursuant to predetermined fraudulent treatment and billing protocols implemented at the No-Fault Clinics. The Prescribers and Clinic Controllers routed the Fraudulent Prescription Forms to the DME Defendants in exchange for kickbacks or other financial incentives.

52.    In keeping with the fact that the prescriptions for the Osteogenesis Stimulators were prescribed and dispensed pursuant to fraudulent treatment protocols rather than genuine patient care, the Fraudulent Prescription Forms used to prescribe the devices were distributed to the No-Fault Clinics by Pro Health and contained pre-printed boilerplate language regarding the alleged medical necessity of the Osteogenesis Stimulators, which language was never changed or individualized by any of the Prescribers with respect to any Insureds.

53.    In further keeping with the fact that the DME Defendants obtained prescriptions for Osteogenesis Stimulators that were not medically unnecessary and provided pursuant to predetermined fraudulent protocols, the DME Defendants: (i) received prescriptions for

Osteogenesis Stimulators from a limited number of Prescribers subsequent to minimally invasive arthroscopic procedures; (ii) the Osteogenesis Stimulators were dispensed to patients who did not suffer from fractured or broken bones; and (iii) upon information and belief, obtained prescriptions for Osteogenesis Stimulators directly from the Clinics without any communication with or involvement by the Insureds.

54.    Further, upon information and belief, to the extent any device was dispensed at all, the DME Defendants dispensed a cheap stimulation device that was not actually an Osteogenesis Stimulator as referenced under HCPCS Code E0760, and which was, in all likelihood, an electromagnetic stimulator having no legitimate, proven documented medical efficacy.

55.    This scheme enabled Defendants to reap large profits from GEICO and other New York automobile insurers through the DME Defendants' submission of inflated charges for No-Fault Benefits for medically unnecessary Osteogenesis Stimulators, or purported Osteogenesis Stimulators.

56.    In all of the claims identified in Exhibit "1", the DME Defendants falsely represented that actual Osteogenesis Stimulators were provided pursuant to lawful prescriptions from healthcare providers, that the Osteogenesis Stimulators were medically necessary, and that the billing submitted for the Osteogenesis Stimulators was proper and lawful, when in fact the prescriptions were not legitimate and were provided pursuant to unlawful financial arrangements, the devices were medically unnecessary, and the billing mischaracterized the devices allegedly provided and inflated the charges to GEICO.

**B. The Fraudulent Billing For Medically Unnecessary Osteogenesis Stimulators**

57.    The DME Defendants billed for dispensing Osteogenesis Stimulators with various accessories ultimately resulting in charges of, at least, $2,700.00 per Insured who purportedly

received one of the devices.

58.    Virtually all of the charges for Osteogenesis Stimulators the DME Defendants submitted, or caused to be submitted, were pursuant to Fraudulent Prescription Forms. The Fraudulent Prescription Forms were distributed to the Prescribers and Clinic Controllers to solicit and steer prescriptions for Osteogenesis Stimulators back to Pro Health.

59.    Osteogenesis Stimulators are devices used to encourage bone growth and accelerate fracture healing.  In fact, a Medicare Administrative Contractor for The Centers for Medicare & Medicaid Services ("CMS") has published guidance stating that electrical osteogenesis stimulators billed under E0760 are covered only if there is evidence of a fracture where at least two sets of radiographs, separated by a minimum of 90 days, were obtained prior to starting treatment with the osteogenesis stimulator.

60.    Specifically, CMS's website references guidance stating as follows:

An ultrasonic osteogenesis stimulator (E0760) is covered only if any of the following criteria are met:

1.    Nonunion of a fracture documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days. Each radiograph set must include multiple views of the fracture site accompanied by a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs; and
2.    The fracture is not of the skull or vertebrae; and
3.    The fracture is not tumor related.

Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

An ultrasonic osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

Use of an ultrasonic osteogenesis stimulator for the treatment of a fresh fracture or delayed union will be denied as not medically necessary.

Ultrasound conductive coupling gel is covered and separately payable if an ultrasonic osteogenesis stimulator is covered.

An ultrasonic osteogenesis stimulator will be denied as not medically necessary if it is used with other noninvasive osteogenesis stimulators.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

61.     Furthermore, various commercial insurers have issued policy bulletins that make clear the use of an osteogenesis stimulator is only necessary to heal bone fractures under very limited circumstances.

62.     Notwithstanding the limited, accepted uses for Osteogenesis Stimulators, the DME Defendants repeatedly purported to bill for expensive Osteogenesis Stimulators under HCPCS Code E0760, with total reimbursable charges of $2,700.000 per device, which devices were purportedly dispensed to numerous Insureds who suffered no bone fractures whatsoever.

63.     To date, Defendants have billed approximately $1 million under HCPCS Code E0760, for Osteogenesis Stimulators since the start of Defendants' fraudulent scheme.

64.     In keeping with the fact that the DME Defendants dispensed and billed for Osteogenesis Stimulators without regard for medically necessity – and solely to exploit the Insureds for financial gain – the DME Defendants in numerous instances billed for allegedly dispensing *two* Osteogenesis Stimulators to a single Insured.  For example:

(i)     Insured WC - 0668062060000002 was purportedly involved in a motor vehicle accident on November 26, 2023. On February 14, 2024, Pro Health dispensed an Osteogenesis Stimulator to WC pursuant to a prescription purportedly ordered by Dr. Basch on February 10, 2024. Thereafter, on June 19, 2024, Pro Health dispensed another Osteogenesis Stimulator to WC pursuant to another prescription purportedly ordered by Dr. Basch on June 15, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through

two separate charges of $2,700.00 each relating to this single Insured.

(ii)     Insured WN - 8762314930000003 was purportedly involved in a motor vehicle accident on December 4, 2023. On May 10, 2024, Pro Health dispensed an Osteogenesis Stimulator to WN pursuant to a prescription purportedly ordered by Dr. Basch on May 4, 2024. Thereafter, on June 7, 2024, Pro Health dispensed an additional Osteogenesis Stimulator to WN pursuant to another prescription purportedly ordered by Dr. Murray on May 31, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(iii)    Insured JA - 8790704500000001 was purportedly involved in a motor vehicle accident on October 29, 2023. On April 30, 2024, Pro Health dispensed an Osteogenesis Stimulator to JA pursuant to a prescription purportedly ordered by Dr. Tehrany on April 16, 2024. Thereafter, on July 24, 2024, Pro Health dispensed an additional Osteogenesis Stimulator to JA pursuant to another prescription purportedly ordered by Dr. Basch on July 13, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(iv)     Insured JPR - 0668062060000002 was purportedly involved in a motor vehicle accident on November 26, 2023. On April 26, 2024, Pro Health dispensed an Osteogenesis Stimulator to JPR pursuant to a prescription purportedly ordered by Dr. Basch on April 12, 2024. Thereafter, on August 14, 2024, Pro Health dispensed an additional Osteogenesis Stimulator to JPR pursuant to another prescription purportedly ordered by Dr. Basch on August 7, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(v)      Insured JS – 0560156710000003 was purportedly involved in a motor vehicle accident on July 29, 2024. On October 24, 2024, Pro Health dispensed an Osteogenesis Stimulator to JS pursuant to a prescription purportedly ordered by Dr. Moral. Thereafter, on December 5, 2024, Pro Health dispensed an additional Osteogenesis Stimulator to JS pursuant to another prescription purportedly ordered by Dr. Moral on November 22, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(vi)    Insured PJ – 0678676080000006 was purportedly involved in a motor vehicle accident on November 6, 2023. On January 31, 2024, Pro Health dispensed an Osteogenesis Stimulator to PJ pursuant to a prescription purportedly ordered by Dr. Basch on January 27, 2024. Thereafter, on May 23, 2024, Pro Health dispensed another Osteogenesis Stimulator to PJ pursuant to another prescription purportedly ordered by Dr. Murray on May 17, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(vii)   Insured LPD – 0678676080000006 was purportedly involved in a motor vehicle accident on November 6, 2023. On February 5, 2024 Pro Health dispensed an Osteogenesis Stimulator to LPD pursuant to a prescription purportedly ordered by Dr. Basch on January 27, 2024. Thereafter, on March 1, 2024, Pro Health dispensed another Osteogenesis Stimulator to LPD pursuant to another prescription purportedly ordered by Dr. Basch on February 24, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

(viii)  Insured DS – 0560156710000003 was purportedly involved in a motor vehicle accident on July 29, 2024. On October 12, 2024, Pro Health dispensed an Osteogenesis Stimulator to DS pursuant to a prescription ordered by Dr. Moral on October 7, 2024. Thereafter, on December 5, 2024, Pro Health dispensed an additional Osteogenesis Stimulator to DS pursuant to another prescription ordered by Dr. Moral on November 8, 2024.

In connection with the above, Pro Health billed GEICO $5,400.00 through two separate charges of $2,700.00 each relating to this single Insured.

These are just representative samples.

65.    The DME Defendants represented that they received multiple legitimate prescriptions for medically necessary DME from healthcare practitioners licensed to issue such prescriptions, and that the DME identified in the bills was actually provided to the Insureds, but the Osteogenesis Stimulators billed by the Defendants were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed

solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

66.    The Fraudulent Prescription Forms – including the medical necessity language contained therein – were created and distributed to facilitate the prescription Osteogenesis Stimulators. The Fraudulent Prescription Forms contain a boilerplate, non-individualized "explanation" for the prescription of the Osteogenesis Stimulators. However, none of the prescriptions ever contain a discussion of any of the patients' actual individual needs and diagnoses.

67.    Further, virtually all of the Insureds who received Osteogenesis Stimulators from Pro Health were involved in relatively minor, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all, and did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

68.    In fact, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

69.    To the extent that the Insureds did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and discharged with nothing more serious than a minor soft tissue injury such as a sprain or strain.

70.    Despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with the Prescribers were subjected to extremely similar treatment protocols which included physical therapy and chiropractic care, and large volumes of prescriptions for DME and various pharmaceuticals, and minimally invasive arthroscopic procedures.

71.    The prescriptions for the Osteogenesis Stimulators were typically issued subsequent to minimally invasive arthroscopic procedures which did not involve the repair of a fractured or broken bone, pursuant to predetermined fraudulent protocols set forth at the No-Fault Clinics, not because the Osteogenesis Stimulators were medically necessary for each Insured based upon his or her individual symptoms or presentations.

72.    No legitimate physician or professional entity would permit prescriptions for Osteogenesis Stimulators to be issued based upon the fraudulent protocols described herein.

73.    In a legitimate setting, when a patient injured in a motor vehicle accident undergoes a minimally invasive surgery, such as the arthroscopic surgeries performed on the Insureds in Exhibit "1", the surgeon would evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

74.    Furthermore, in a legitimate setting, in determining a specific course of post-surgical rehabilitation, a surgeon <u>may</u> – but does not always – prescribe DME that should aid in the patient's surgical recovery.

75.    In determining whether to prescribe DME as part of a patient's surgical recovery – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME should always directly relate to each patient's individual presentation for post-surgical recovery.

76.    It is extremely improbable – to the point of impossibility – that it would be medically necessary for virtually all of the Insureds identified in Exhibit "1" – who underwent

minimally invasive surgical procedures with a Prescriber– to require the same post-surgical treatment, including prescriptions for Osteogenesis Stimulators, despite being differently situated and without suffering from any bone fractures.

77.     A substantial number of Insureds receiving virtually identical post-operative prescriptions for Osteogenesis Stimulators would, by extension, mean that all those Insureds had the same or substantially similar presentations for post-surgical recovery, and that they suffered from bone fractures that necessitated the prescription of an Osteogenesis Stimulator.

78.     Nevertheless, all the Insureds identified in Exhibit "1" were prescribed identical Osteogenesis Stimulators without regard for the medical necessity of the Osteogenesis Stimulators, the Insureds' individual post-surgical presentation, and ability for post-surgical recovery.

79.     In keeping with the fact that the Insureds were prescribed identical Osteogenesis Stimulators without regard for medical necessity, the Insureds' individual post-surgical presentation, and their ability for post-surgical recovery, the Prescribers purported to prescribe, and the Defendants dispensed, identical Osteogenesis Stimulators to multiple Insureds involved in a single motor vehicle accident.  For example:

(i)     On December 26, 2023, two Insureds -- JP – 0508256290101027 and AVT – 0508256290101027 -- were involved in the same automobile accident. Thereafter, JP and AVT both sought treatment with Dr. Ross of Hank Ross Medical and underwent minimally invasive arthroscopic procedures at an ambulatory surgery center located at 3170 Webster Avenue, Bronx, New York (the "Webster Avenue ASC"). Thereafter, on April 3, 2024, Pro Health dispensed Osteogenesis Stimulators to JP and AVT pursuant to prescriptions ordered by Dr. Ross. JP and AVT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(ii)    On March 1, 2024, two Insureds -- OA – 0564233850101038 and KS – 0564233850101038 -- were  involved in the same automobile accident.

Thereafter, OA and KS both sought treatment with Dr. Basch of Century Medical Group and underwent minimally invasive arthroscopic procedures at an ambulatory surgery center located at 30 West Century Road, Paramus, New Jersey (the "West Century Road ASC"). Thereafter, on June 19, 2024 Pro Health dispensed Osteogenesis Stimulators to OA and KS pursuant to prescriptions ordered by Dr. Basch. OA and KS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(iii)    On February 7, 2024, two Insureds -- SG – 0557633000000006 and CG – 0557633000000006 -- were involved in the same automobile accident. Thereafter, SG and CG both sought treatment with Michael Murray, M.D. ("Dr. Murray") of University Pain Medicine Center and underwent minimally invasive arthroscopic procedures at the West Century Road ASC. Thereafter, on June 7, 2024, Pro Health dispensed Osteogenesis Stimulators to SG and CG pursuant to prescriptions ordered by Dr. Murray. SG and CG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(iv)    On June 30, 2023, two Insureds -- AE – 0667617690000001 and ER – 0667617690000001 -- were involved in the same automobile accident. Thereafter, AE and ER both sought treatment with Dr. Ross of Hank Ross Medical and underwent minimally invasive arthroscopic procedures at the East Tremont Avenue ASC and an ambulatory surgery center located at 313 43rd Street, Brooklyn, New York (the "43rd Street ASC"), respectively. Thereafter, on September 20, 2023, and October 9, 2023, respectively, Pro Health dispensed Osteogenesis Stimulators to AE and ER pursuant to prescriptions ordered by Dr. Ross. AE and ER were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(v)    On September 15, 2023, three Insureds -- LR – 8709481240000004, JR – 8709481240000004, and CD – 8709481240000004 -- were involved in the same automobile accident. Thereafter, LR, JR, and CD sought treatment with Dr. Ross of Hank Ross Medical and underwent minimally invasive arthroscopic procedures at the Webster Avenue ASC and East Tremont

Avenue ASC, respectively. Thereafter, on November 9, 2023, and December 13, 2023, respectively, Pro Health dispensed Osteogenesis Stimulators to LR, JR, and CD pursuant to prescriptions ordered by Dr. Ross. LR, JR, and CD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(vi)    On July 29, 2024, two Insureds -- BR – 8720197300000008 and VP – 8720197300000008 -- were involved in the same automobile accident. Thereafter, BR and VP both sought treatment with Dr. Ross of Hank Ross Medical and underwent minimally invasive arthroscopic procedures at the East Tremont Avenue ASC and Webster Avenue ASC, respectively. Thereafter, on September 18, 2024, and October 23, 2024, respectively, Pro Health dispensed Osteogenesis Stimulators to BR and VP pursuant to prescriptions ordered by Dr. Ross. BR and VP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(vii)    On May 4, 2024, three Insureds -- AD – 0671189090000004, AAG – 0671189090000004, and QM – 0671189090000004 -- were involved in the same automobile accident. Thereafter, AD, AAG, and QM sought treatment with Dr. Basch and Dr. Moral of Century Medical Group, respectively, and underwent minimally invasive arthroscopic procedures at the West Century Road ASC. Thereafter, on July 23, 2024, and October 24, 2024, respectively, Pro Health dispensed Osteogenesis Stimulators to AD, AAG, and QM pursuant to prescriptions ordered by Dr. Basch and Dr. Moral. AD, AAG, and QM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(viii)    On January 18, 2024, two Insureds -- DH – 8755844530000003 and RT – 8755844530000003 -- were involved in the same automobile accident. Thereafter, DH and RT both sought treatment with Dr. Basch of Century Medical Group and underwent minimally invasive arthroscopic procedures at the West Century Road ASC. Thereafter, on June 26, 2024, and July 23, 2024, respectively, Pro Health dispensed Osteogenesis Stimulators to DH and RT pursuant to prescriptions ordered by Dr. Basch. DH and RT were

different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

(ix)    On April 29, 2024, three Insureds -- NM – 0612021040000005, YZF – 0612021040000005, and WL – 0612021040000005 -- were involved in the same automobile accident. Thereafter, NM, YZF, and WL sought treatment with Dr. Moral of Century Medical Group and underwent minimally invasive arthroscopic procedures at the West Century Road ASC. Thereafter, on September 12, 2024, October 23, 2024, and December 5, 2024, respectively, Pro Health dispensed Osteogenesis Stimulators to NM, YZF, and WL pursuant to prescriptions ordered by Dr. Moral. NM, YZF, and WL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Osteogenesis Stimulators that were dispensed by Pro Health.

These are just representative examples.

80.    In a legitimate clinical setting, if a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and symptoms, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why it was medically necessary for the patients.

81.    To the contrary here, to the extent there was a contemporaneously dated evaluation report, the Prescribers virtually always failed to document the medical necessity of the Osteogenesis Stimulators and other DME and oftentimes failed to even identify the DME purportedly prescribed.

82.    In a legitimate setting, when a patient returns for a post-operative follow-up examination, the surgeon would inquire – and appropriately report – whether the previously prescribed DME aided the patient's recovery. Such information is typically included so the

healthcare provider can recommend a further course of treatment regarding the previously prescribed DME, issue new DME, or discontinue the use of DME altogether.

83.    However, follow-up examination reports issued by Prescribers, to the extent there were follow-up examinations, failed to include <u>any</u> information regarding the Osteogenesis Stimulators that were previously prescribed to the Insureds.  For example, the follow-up reports failed to document whether the patient used the Osteogenesis Stimulator, whether the DME was effective, and/or if the Insured made any progress as a result of the Osteogenesis Stimulator.  In fact, the follow-up reports demonstrate that Prescribers failed to monitor each Insured's use of the Osteogenesis Stimulators and are further evidence the Osteogenesis Stimulators were prescribed as part of a predetermined protocol.

84.    Moreover, Insureds frequently denied even receiving an Osteogenesis Stimulator that the DME Defendants purported to dispense and for which they sought reimbursement from GEICO.

85.    By submitting bills to GEICO seeking No-Fault Benefits for the Osteogenesis Stimulators, Defendants represented that they provided Insureds DME that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

86.    However, the DME was not medically necessary.  Rather it was prescribed pursuant to predetermined fraudulent protocols and collusive referral arrangements among Defendants.

87.    Moreover, upon information and belief, the DME Defendants never actually dispensed genuine Osteogenesis Stimulators despite submitting billing to GEICO seeking reimbursement of $2,700.00 per device, under HCPCS Code E0760.

88.    To the extent any device was dispensed at all, Defendants dispensed, in all likelihood, a cheap, wearable electromagnetic therapy device to the Insureds, which purports to

use electromagnetic stimulation to provide pain relief.  Various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational.

89.    Regardless of the particular type of device submitted, the DME was prescribed pursuant to predetermined protocols designed to maximize profits, and not based upon medical necessity.

### C. The Prescriptions for the Osteogenesis Stimulators Were Issued Pursuant to Collusive Arrangements

90.    To gain access to Insureds so that the DME Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the DME Defendants entered into collusive agreements with the Prescribers and Clinic Controllers in order to direct prescriptions to Pro Health that were illegitimate and for medically unnecessary DME.

91.    In keeping with the fact that the DME Defendants obtained prescriptions for Osteogenesis Stimulators pursuant to collusive, financial referral agreements, approximately 93% of the billing for Osteogenesis Stimulators submitted by Pro Health to GEICO from 2023 to present originated from only three providers -- Hank Ross, M.D. ("Dr. Ross") of Hank Ross Medical P.C. ("Hank Ross Medical"), David Basch, M.D. ("Dr. Basch") of both Century Medical Group ("Century Medical") and Ortho & Pain Center of NJ ("Ortho & Pain"), and Mohammed Moral, M.D. ("Dr. Moral") of Century Medical Group – who purported to first examine Insureds at multiple "clinic" locations.

92.    Based on unlawful financial arrangements, the Defendants received prescriptions for medically unnecessary Osteogenesis Stimulators pursuant to predetermined prescription protocols, including prescriptions that contained a photocopied signature of the Prescriber.

93.   For example:

(i)   On February 12, 2024, Dr. Ross purportedly prescribed an Osteogenesis Stimulator to an Insured named RL – 0101519810101141. Pursuant to Dr. Ross's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(ii)  On February 5, 2024, Dr. Ross purportedly prescribed an Osteogenesis Stimulator to an Insured named SG – 0609118310000002. Pursuant to Dr. Ross's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(iii) On July 8, 2024, Dr. Ross purportedly prescribed an Osteogenesis Stimulator to an Insured named RS – 0175034050101096. Pursuant to Dr. Ross's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(iv)  On May 18, 2024, Dr. Basch purportedly prescribed an Osteogenesis Stimulator to an Insured named MC – 8794577320000001. Pursuant to Dr.

Basch's prescription, the Defendants submitted charges to GEICO totaling $2,700.00 The prescription contained the following photocopied or stamped signature:



(v)    On May 4, 2024, Dr. Basch purportedly prescribed an Osteogenesis Stimulator to an Insured named WN – 8762314930000003. Pursuant to Dr. Basch's prescription, the Defendants submitted charges to GEICO totaling $2,700.00 The prescription contained the following photocopied or stamped signature:



(vi)    On February 10, 2024, Dr. Basch purportedly prescribed an Osteogenesis Stimulator to an Insured named CB – 8718728780000001. Pursuant to Dr. Ross's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:

(vii)    On September 12, 2024, Dr. Moral purportedly prescribed an Osteogenesis Stimulator to an Insured named AU – 0560156710000003. Pursuant to Dr. Moral's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(viii)    On November 8, 2024, Dr. Moral purportedly prescribed an Osteogenesis Stimulator to an Insured named CS – 8825733630000002. Pursuant to Dr. Moral's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(ix)    On November 12, 2024, Dr. Moral purportedly prescribed an Osteogenesis Stimulator to an Insured named WL – 0612021040000005. Pursuant to Dr. Moral's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:



(x)    On September 19, 2024, Dr. Moral purportedly prescribed an Osteogenesis Stimulator to an Insured named NE – 8771762250000003. Pursuant to Dr. Moral's prescription, the Defendants submitted charges to GEICO totaling $2,700.00. The prescription contained the following photocopied or stamped signature:

94.    These are only representative samples.

95.    The DME Defendants received the prescriptions for Osteogenesis Stimulators purportedly issued by the Prescribers as part of the unlawful financial arrangements with them and the Clinic Controllers at the No-Fault Clinics, without going through the Insureds.

96.    Not surprisingly, Dr Ross, owner of Hank Ross Medical P.C., has a history of professional misconduct that has resulted in discipline by the State of New York Board for Professional Medical Conduct (the "New York State Board"). In August 2006 the New York State Board suspended Dr. Ross' license for two years, stayed with probation.  By Order dated August 8, 2006, the Administrative Review Board concluded, among other things, that Dr. Ross was guilty of engaging in conduct which evidences moral unfitness during the practice of medicine, practicing fraudulently, filing false reports, and violating New York State Public Health Law Section 2805-k.  In May 2012, the New York State Department of Education Board of Regents further stayed the suspension and imposed a term of probation until December 7, 2015.

97.    Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the ambulatory surgical centers/clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care, and select and dictate the downstream providers (like DME companies) that receive prescriptions and referrals issued at the No-Fault Clinics.  These predetermined protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

98.    The DME Defendants did not make any attempts to legitimately market or advertise to the general public, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

99.    Similarly, the DME Defendants did virtually nothing that would be expected of the owners of a legitimate DME supply company to develop their reputation in the medical community, or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

100.    In fact, as noted above, Kandinov himself – the purported sole owner and sole employee of Pro Health – does not even know what an Osteogenesis Stimulator is used for and is not aware of any of the indications for when this device could be medically necessary for a patient.

101.    Instead, the DME Defendants entered collusive agreements with the Prescribers and Clinic Controllers associated with No-Fault Clinics and steered them to prescribe and direct large volumes of prescriptions to Pro Health for the specifically targeted Osteogenesis Stimulators in exchange for kickbacks or other financial incentives.

102.    The Prescribers had no legitimate medical reason to prescribe, and Pro Health had no legitimate reason to dispense, Osteogenesis Stimulators in large quantities to the Insureds.

103.    Nevertheless, since the inception of the fraudulent scheme, the DME Defendants engaged in various collusive arrangements pursuant to which the DME Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Prescribers and Clinic Controllers that could then be used to support the charges submitted to GEICO and other insurers for the Osteogenesis Stimulators purportedly dispensed by Pro Health.

104.    Upon information and belief, the Prescribers were compensated either directly by the DME Defendants or through some other economic "in kind" arrangement effectuated through the Clinic Controllers, such as a quid-pro-quo arrangement that gave the Prescribers the ability to treat the Insureds at the No-Fault Clinics and separately bill GEICO.

105.    But for the payments of kickbacks or other financial quid-pro-quo arrangements

established in connection with the treatment of Insureds at the No-Fault Clinics, the Prescribers would not have prescribed the Osteogenesis Stimulators, and the Prescribers and Clinic Controllers would not have directed the prescriptions to Pro Health.

106.    The DME Defendants, Prescribers, and Clinic Controllers affirmatively concealed the amounts paid as compensation for steering the prescriptions to Pro Health since such compensations arrangements are the very kind of agreements that are prohibited by N.Y. Public Health Law § 238-d without a specific disclosure to the patient of the financial relationship.  In actuality, no such disclosure required by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibits "1".

107.    In all of the claims identified in Exhibit "1", Defendants knowingly misrepresented that the Osteogenesis Stimulators were provided pursuant to lawful prescriptions from healthcare providers and were, therefore, entitled to collect No-Fault Benefits in the first instance, when the prescriptions were provided – to the extent provided at all – pursuant to unlawful financial arrangements.

**D.    <u>The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO</u>**

108.    To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through Pro Health to GEICO seeking payment for the Osteogenesis Stimulators that the Defendants were not entitled to receive.

109.    The DME Defendants' billing forms (i.e., NF-3 and/or HCFA-1500 forms) and treatment reports submitted to GEICO by and on behalf of Pro Health Medical Choice were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Osteogenesis Stimulators pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Osteogenesis Stimulators, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants, and others not presently known, without regard for genuine patient care, and included dispensing Osteogenesis Stimulators that were not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Osteogenesis Stimulators pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Osteogenesis Stimulators, it was pursuant to a fraudulent scheme that included dispensing Osteogenesis Stimulators (a) based on prescriptions secured through collusive arrangements, and (b) based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(iii)   The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Osteogenesis Stimulators pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Osteogenesis Stimulators, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items; and

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the DME Defendants provided Osteogenesis Stimulators that directly corresponded to the HCPCS Codes contained within each form, and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any DME to the Insureds – the purported Osteogenesis Stimulators often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 and/or HCFA-1500 forms; and otherwise inflated the charges to GEICO.

## IV.  The DME Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

110.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

111.    To induce GEICO to promptly pay the fraudulent charges for the Osteogenesis Stimulators, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

23.    Specifically, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Osteogenesis Stimulators were pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others without regard for genuine patient care.

24.    Additionally, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the DME was pursuant to an insurance fraud scheme, which included dispensing Osteogenesis Stimulators that were not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

25.    Furthermore, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the provision of the Osteogenesis Stimulators dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

26.    In addition, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Code for the purported Osteogenesis

Stimulators contained in the bills submitted by the DME Defendants to GEICO did not accurately reflect the type of DME purportedly provided to the Insureds.

112.    The billing and supporting documentation submitted by the DME Defendants for the Osteogenesis Stimulators, when viewed in isolation, did not reveal its fraudulent nature.

113.    The DME Defendants hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through Pro Health to monetize the scheme.  These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Defendants continue to have legal counsel pursue individual collection actions against GEICO and other insurers without regard for the fact Pro Health was engaged in fraud.

114.    The DME Defendants' ongoing collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

115.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

116.    The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO

incurred damages of approximately $261,600.00 based upon the fraudulent charges submitted to GEICO for the Osteogenesis Stimulators.

117.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against the DME Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

118.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

119.    There is an actual case in controversy between GEICO and the DME Defendants regarding approximately $713,600.00 in pending No-Fault insurance billing for the Osteogenesis Stimulators that has been submitted to GEICO under the name of Pro Health.

120.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because Pro Health billed GEICO for purported Osteogenesis Stimulators pursuant to a fraudulent scheme designed and implemented to exploit the patients for financial gain, without regard for genuine patient care, and which included dispensing Osteogenesis Stimulators that were not medically necessary and which were prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements and which were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

121.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because Pro Health billed GEICO for Osteogenesis Stimulators that were provided – to the extent actually provided – as a result of decisions made by laypersons rather than

licensed healthcare professionals.

122.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because, to the extent that any Osteogenesis Stimulators were provided to Insureds, the bills for the Osteogenesis Stimulators submitted to GEICO fraudulently misrepresented the type and nature of devices provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

123.    The DME Defendants have no right to receive payment for any pending bills submitted to GEICO because, to the extent that any Osteogenesis Stimulators were provided to Insureds, the bills for Osteogenesis Stimulators submitted to GEICO fraudulently inflated the permissible reimbursement rate that the Defendants could have received for the devices.

124.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Pro Health.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against the DME Defendants**
**(Common Law Fraud)**

125.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

126.    The DME Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Osteogenesis Stimulators.

127.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Osteogenesis Stimulators that were dispensed were for reasonable and medically necessary DME when in fact they were dispensed pursuant to an

insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit Pro Health, Kandinov, and John Doe Defendants, without regard for genuine patient care, and included dispensing Osteogenesis Stimulators that were was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) in every claim, that the Osteogenesis Stimulators dispensed were pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the DME was dispensed based on prescriptions secured through collusive arrangements and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in every claim, that Osteogenesis Stimulators were dispensed based upon legitimate prescriptions by licensed healthcare providers when DME was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME; and (iv) in every claim, to the extent that any Osteogenesis Stimulators were actually provided, that the DME provided to the Insureds accurately reflected the HCPCS Code contained in the bills submitted to GEICO when in fact the DME did not meet the requirements for the specific HCPCS Codes billed to GEICO and the bills were inflated. A representative sample of the fraudulent billings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

128.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $261,600.00 pursuant to the fraudulent bills submitted through Pro Health.

129.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against the DME Defendants
### (Unjust Enrichment)

130.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

131.    As set forth above, the DME Defendants s engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

132.    When GEICO paid the bills and charges submitted by or on behalf of Pro Health for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the DME Defendants' improper, unlawful, and/or unjust acts.

133.    The DME Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the DME Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

134.    The retention of GEICO's payments by the DME Defendants violates fundamental principles of justice, equity and good conscience.

135.    By reason of the above, the DME Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $261,600.00

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Kandinov
### (Violation of RICO, 18 U.S.C. § 1962(c))

136.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

137.    Pro Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

138.    Kandinov knowingly conducted and/or participated, directly or indirectly, in the

conduct of Pro Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately two years, and to continue efforts to collect on those charges to the present, seeking payments that Pro Health was not eligible to receive under the No-Fault Laws because (i) the bills submitted to GEICO for the provision of Osteogenesis Stimulators were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing DME that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Osteogenesis Stimulators were dispensed based on prescriptions secured through collusive arrangements, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Osteogenesis Stimulators were dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (iv) to the extent that Pro Health actually provided DME to the Insureds, the bills to GEICO fraudulently mischaracterized the type of DME dispensed and permissible reimbursement amounts for each item and inflated the charges to GEICO. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1."

139.    Pro Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kandinov operated Pro Health, inasmuch as Pro Health never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits, and acts of

mail fraud therefore were essential in order for Pro Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Pro Health to the present day.

140.    Pro Health is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Pro Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

141.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $261,600.00 pursuant to the fraudulent bills submitted through Pro Health.

142.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Kandinov and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

143.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

144.    Pro Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

145.    Kandinov and the John Doe Defendants are employed by and/or associated with the Pro Health enterprise.

146.    Kandinov and the John Doe Defendants knowingly agreed, combined and conspired

to conduct and/or participate, directly or indirectly, in the conduct of Pro Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately two years, and to continue efforts to collect on those charges to the present, seeking payments that Pro Health was not eligible to receive under the No-Fault Laws because (i) the bills submitted to GEICO for the provision of Osteogenesis Stimulators were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing DME that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Osteogenesis Stimulators were dispensed based on prescriptions secured through collusive arrangements, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Osteogenesis Stimulators were dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (iv) to the extent that Pro Health actually provided DME to the Insureds, the bills to GEICO fraudulently mischaracterized the type of DME dispensed and permissible reimbursement amounts for each item and inflated the charges to GEICO. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1."

147.    Kandinov and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

148.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $261,600.00 pursuant to the fraudulent bills submitted through Pro Health.

149.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs, GEICO, demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the DME Defendants a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that DME Defendants have no right to receive payment for any pending bills, amounting to approximately $713,600.00, submitted to GEICO under the name of Pro Health;

B.    On the Second Cause of Action against the DME Defendants compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, ogether with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

C.    On the Third Cause of Action again the DME Defendants, an award in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

D.    On the Fourth Cause of Action against Kandinov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper; and

E.    On the Fifth Cause of Action against Kandinov and the John Doe Defendants,

compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper;

Dated: January 28, 2026
      Uniondale, New York

                           RIVKIN RADLER LLP

                         By:   /s/ *Michael A. Sirignano*

                            Michael A. Sirignano, Esq.
                            Barry I. Levy, Esq.
                            Rawson Jahan, Esq.
                       926 RXR Plaza
                       Uniondale, New York 11556
                       (516) 357-3000

                       *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*